# UNITED STATES DISTRICT COURT

_____ SOUTHERN _____ DISTRICT OF _____ CALIFORNIA

FILED

In the Matter of the Search of

06 NOV -3 AM 10: 43

1.  117 H Street
    Brawley, CA 92227

**APPLICATION AND AFFIDAVIT**
SOUTHERN DISTRICT OF CALIFORNIA

BY: _____ DEPUTY

CASE NUMBER: '06 MJ 2023

*ORDERED SEALED*

I, __Luis A. Samaniego_____, being duly sworn depose and say:

I am a __Senior Patrol Agent of the United States Border Patrol__, and I have reason to believe that property or premises known as:

See Attachment "A"

in the Southern District of California there is now concealed a certain person or property, namely,

See Attachment "B"

which is:  property that constitutes evidence of the commission of criminal offenses, contraband, fruits of crimes, things otherwise criminally possessed, and property designed, and intended for use

concerning violations of 8 U.S.C. §§ 1324 (a)(2)(B)(ii); 1324 (a)(1)(A)(iii) and (v)(I); 1324 (a)(2)(B)(ii); 1324 (a)(1)(A)(ii) and (v)(II); and 1324 (a)(1)(A)(iii) and (v)(II).

The facts support a finding of Probable Cause are as follows:

See attached Affidavit of Senior Patrol Agent Luis A. Samaniego of the United States Border Patrol which is attached and incorporated herein by reference.

Continued on the attached sheet and made a part thereof.   X Yes ____ No

_____
Signature of Affiant

Sworn to before me, and subscribed in my presence

__10/20/06__ at ___San Diego, CA___
Date                    City and State

**LOUISA S. PORTER**
**U.S. MAGISTRATE JUDGE**
Name and Title of Judicial Officer

_____
Signature of Judicial Officer

## AFFIDAVIT IN SUPPORT OF APPLICATIONS

I, Luis A. Samaniego, Senior Patrol Agent (SPA), United States Border Patrol (USBP), being duly sworn, depose and state:

### A.    Purpose of This Affidavit

1.    This affidavit is submitted in support of application for the issuance of a search warrant for the following premise which is the residence of Georgina Perfino, the legal wife of Javier Sanchez-Perfino and frequented by Javier Sanchez-Perfino: A single-family residence at 117 H Street, Brawley, California 92227 (more fully described in Attachment A, incorporated herein by reference).

2.    This search is to include all rooms, storage areas, closets, briefcases, safes, garages, outbuildings, and appurtenances assigned to or part of the above described premises.

3    A description of items to be seized is set forth in Attachment B, incorporated herein by reference. Because the purpose of this affidavit is merely to provide probable cause for the issuance of search warrants, it does not contain all information developed in connection with the investigation described herein.

4.    Based on the facts set forth herein, I submit there is probable cause to believe that Javier Sanchez-Perfino has committed the following offenses: (a) Conspiracy to Bring in Illegal Aliens for Financial Gain in violation of 8 U.S.C. § 1324(a)(2)(B)(iii); (b) Conspiracy to Harbor Illegal Aliens in violation of 8 U.S.C. § 1324(a)(2)(B)(ii); (c) Bringing in Illegal Aliens for Financial Gain in violation of 8 U.S.C. § 1324(a)(1)(A)(ii); (d) Transportation of illegal aliens in violation of 8 U.S.C. § 1324 (a)(1)(A)(ii) and (v)(II); and (e) Harboring Illegal Aliens in violation of 8 U.S.C. § 1324 (a)(1)(A)(iii).   Javier Sanchez-Perfino was indicted for all of the above listed crimes on October 18, 2006 on a Secret Indictment that remains sealed. Along with the Secret Indictment, a

Secret Arrest Warrant was issued for Javier Sanchez Perfino on October 18, 2006. The Indictment and Warrant remain sealed at this time and the warrant applied for with this Affidavit, if issued, will be executed in conjunction with Javier Sanchez-Perfino's arrest.

5.     The information set forth below is based upon my personal observations, my conversations with other law enforcement personnel, my review of reports prepared by myself or other law enforcement personnel, and conversations with other witnesses.

**B.     Glossary**

6.     The terms set forth below are widely utilized by law enforcement officers when referring to the duties and/or roles of alien smuggling conspirators and operational sites:

a.     <u>Sponsors</u>. The relatives, friends, or prospective employers of smuggled aliens who aid by paying the smuggling fees (such a transaction is hereinafter referred to as a "buy-out").

b.     <u>Load houses</u>. Premises utilized to harbor and conceal undocumented aliens while awaiting further transportation north and/or pending delivery within the United States.

c.     <u>Administrative houses</u>. Premises utilized to keep accounting/bookkeeping records of smuggling activities and arrange for such activities via telephone.

d.     <u>Scout vehicles</u>. Vehicles utilized to detect law enforcement presence along the smuggling routes within the operational corridor.

e.     <u>Load vehicles</u>. Vehicles utilized to transport undocumented aliens further north within the operational corridor.

f.     <u>Counter-Surveillance</u>. A technique employed by smugglers to detect and/or evade law enforcement surveillance.

## C.    Training and Experience

7.    I have been employed by the USBP since February of 1983 and am currently assigned to the El Centro Sector Smuggler Target Action Team. The Sector Smuggler Target Action Team is tasked with gathering intelligence, investigating, arresting, and prosecuting alien smuggling organizations that utilize the Southern District of California as an operational corridor. These investigations are complex criminal investigations of mid- to high-level criminal smuggling organizations.

8.    During my career, I have assisted in the targeting of multiple smuggling organizations, which resulted in the issuance of arrest warrants, search warrants, seizure warrants and the indictments/convictions of persons for alien smuggling. These persons include drivers, recruiters, arrangers, document providers, and top-level managers.

9.    In the course of my duties, I investigate and prepare for prosecution cases against persons involved in the inducement of illegal entry of undocumented aliens into the United States; the smuggling of undocumented aliens into the United States; the transportation and harboring of undocumented aliens within the United States; and the utilization of illegally-obtained, counterfeit, altered or genuine immigration documents by undocumented aliens to illegally gain entry or remain in the United States.

10.    It is my experience, and the experience of many law enforcement officers with whom I have worked and conversed, that a conspiracy to smuggle aliens, and the smuggling of aliens, generates many types of evidence. The common fruits and instrumentalities of the crimes of alien smuggling, transportation of illegal aliens and harboring illegal aliens include, but are not limited to:  passports, altered or fraudulent identification and immigration documents, various forms of United States Government documentation relating to alienage; travel documents; foreign and

domestic correspondence relating to alien smuggling arrangements; airline/airfare tickets; lists containing names of associates and arrangers; lists containing names of smuggled aliens along with their destinations and fees paid or to be paid; vehicle registrations of vehicles used in the smuggling and transporting of illegal aliens; financial records; bank statements; telephone records and bills; documents and receipts relating to evidence of temporary lodging of illegal aliens; documents indicating possession, dominion, and/or control of premises; property of smuggled aliens in the form of wallets, purses, suitcases, tote bags, and clothing; utility bills; money orders and money order receipts.

11.    In my experience as an agent, I know that these fruits and instrumentalities of the crime of alien smuggling are frequently stored and maintained at other locations than the load houses or administrative houses.  These locations are often the residence, home office, garages, businesses, storage units, computers, hard drives, disks and automobiles of the criminal participants and members of the alien smuggling organization.

**D.    Summary of Investigation**

12.    In February of 2003, the U.S. Border Patrol, Anti-Smuggling Unit began investigating an alien smuggling organization that arranges transportation and harboring for undocumented aliens in Imperial County.  As described herein, the investigation has revealed that undocumented aliens are transported to load houses/lay-up areas in the Imperial County, and then north to Los Angeles, California.  Arrangements are then made for the delivery of the undocumented aliens to their sponsors after payment of the smuggling fee.  As described herein, the investigation has identified: (1) two administrative houses: one located at 685 N. Adams Avenue, Brawley, California and another located at 117 H Street, Brawley, California.

13.     Described below is a series of events including apprehensions, arrests, surveillance, and witness statements. Based on these events and information, there is probable cause to believe that members of an alien smuggling organization are utilizing the aforementioned residence to conduct administrative operations, in violation of 8 U.S.C. § 1324.

14.     On February 24, 2003, an undocumented alien (hereafter, "UA") was apprehended by U. S. Border Patrol Agents from the Indio Station at the Highway 111 U. S. Border Patrol Checkpoint near Niland, California. The UA stated that he had information about a large group of undocumented aliens being held in a "drophouse" in El Centro, California. The UA was then transported to the El Centro Border Patrol Station in El Centro, California. The UA was interviewed by Anti-Smuggling Unit, Special Agent Victor Esparza regarding the large group of undocumented aliens and the location of the "drophouse". The UA then took Special Agent Esparza and Senior Patrol Agent Robert Moyron to the "drophouse" which was located outside of the city limits of El Centro. The address of the drophouse was identified as 1855 Cannon Road. Subsequently, agents apprehended four (4) principals and ninety-three (93) undocumented aliens. While agents were still at the "drophouse" at 1855 Cannon Road, the owner of the house, Roy Gallegos, drove up to the front of the house and spoke with SA V. Esparza. Mr. Gallegos stated to SA Esparza that he was renting the house to a subject by the name of Javier Perfino and that Perfino pays $600.00 a month for the rental of the house. Mr. Gallegos stated that he has been renting the house to Perfino since August of 2002. Agents also found a telephone bill from SBC and a bill from the Imperial Irrigation District with the address of 1855 Cannon Road, El Centro, CA in Javier Perfino's name. In the front of the house, there were four (4) vehicles that were used in transporting the undocumented aliens to 1855 Cannon Road. One of the vehicles, a 1984 Jeep Cherokee 4x4 with California license number 4LSF127, is registered to Javier Perfino and is seized.

15.    On August 4, 2003, Senior Patrol Agents Ian Pavis, Todd Coovert and Joseph Shailor were assigned to the El Centro Sector Anti-Smuggling Unit. The agents were conducting operations in the Chocolate Mountains near Niland, California. The Chocolate Mountains are a mountain range which lies to the east of Highway 111 on the eastern side of Imperial County, California. The entire area is a military restricted zone and a live bombing range. Numerous passes traverse the mountains and these passes are used on a frequent and consistent basis by smugglers in order to circumvent the permanent United States Border Patrol Checkpoints which surround the area. Once the smugglers drive through the mountains, they are able to access Interstate 10, leading to Los Angeles, California and surrounding areas. At approximately 12:30 a.m., agents stopped a "load vehicle" and apprehended two (2) principals and fifteen (15) undocumented aliens. The vehicle was a 1992 Green Chevrolet Suburban and did not have any license plates. The vehicle was seized and was to be recovered the next day due to the remoteness and the vehicle being inoperable.

16.    On August 5, 2003, Senior Patrol Agents Ian Pavis, Todd Coovert and Joseph Shailor were assigned to the El Centro Sector Anti-Smuggling Unit. The agents were conducting operations in the Chocolate Mountains near Niland, California. At approximately 11:30 p.m., while the agents were in the area, a green Chevrolet Suburban passed their hidden location. The agents noticed that it was the same vehicle they had stopped the prior day. Moments later, another vehicle approached their location. This vehicle was a green Jeep Grand Cherokee with California license plates of 3GQF012. The driver of the green Chevrolet Suburban was able to abscond and was not stopped. The driver of the green Jeep Grand Cherokee was stopped. The driver was identified as Socorro Bernal, a legal permanent resident alien. The address for Bernal as per his California Driver's License was 1051 E. Main Street, Brawley, California. The registered owner of the Jeep Cherokee was Javier S. Perfino with an address of 155 G Street #12, Brawley, California. Initially Bernal

stated he had not seen any other vehicles in the area. Bernal then changed his story and stated that he had jumpstarted the Chevrolet Suburban for an unknown individual he happened to encounter in the middle of the mountains.

17.    On August 8, 2003, Senior Patrol Agent Felix Cisneros Jr. from the Indio Border Patrol Station received a telephone call from a source of information (SOI#1). The SOI#1 stated he had information regarding a smuggling organization that had smuggled him into the United States. The SOI#1 stated that on July 19, 2003, he was approached by an unknown man in Mexicali, Baja California, Mexico who offered to smuggle him into the U.S. for $1,200 dollars. The SOI#1 stated that after he was smuggled into the U.S., he was taken to the parking lot of Pep Boys in Calexico, California. The SOI#1 stated he was then instructed to get into a white Dodge Intrepid. The SOI#1 stated he was then transported to an unknown house in EL Centro, California. The SOI#1 stated he was transported the next day to a ranch in Westmorland, California in a Nissan Altima. After two days, the SOI#1 stated he was picked up in a dark maroon Jeep Cherokee and moved to a trailer park in Brawley, California. The SOI#1 stated that Javier Sanchez-Perfino arrived in a late 90's black Yukon 4x4 and introduced himself. The SOI#1 also stated that Javier Sanchez-Perfino gave him two phone numbers (760-562-6967 and 760-455-2856) so he (Perfino) could be contacted in case he (SOI#1) knew of anyone else needing to be smuggled into the U.S. The SOI#1 stated he was then transported by Javier Sanchez-Perfino to another location in Brawley. The SOI#1 said there was a white Suburban parked in the yard when he arrived. The SOI#1 said that a total of eighteen (18) undocumented aliens were loaded into the white Suburban. The SOI#1 stated he recalled the route of travel from Brawley as being north on Highway 111 to Niland, California. Once in Niland, the SOI#1 stated they traveled over the railroad tracks and into the mountains. The SOI#1 claimed that after about an hour into the trip, they had vehicle problems. The passenger (the

SOI#1 had heard that he was called "Morro") made a call via his radio advising Javier Sanchez-Perfino of the vehicle problem. Approximately 2 ½ hours later, the SOI#1 said that a blue Suburban had arrived to pick them up. The SOI#1 stated that the driver of the blue Suburban was called "Chilango". After about 1 ½ hours, the SOI#1 claimed they reached Interstate 10. The SOI#1 then stated that he overheard "Morro" conversing with someone saying that the Suburban was too weighed down and was not sure if it was going to make it. After the conversation, the driver of the Suburban exited on one of the off ramps from Interstate 10 and they met with Javier Sanchez-Perfino. The SOI#1 stated that Javier Sanchez-Perfino had been parked near the off ramp in the black Yukon 4x4. The SOI#1 stated that himself with "Chilango" and three other undocumented aliens exited the Suburban and got unto the black Yukon. The SOI#1 stated they traveled westbound on Interstate 10 and exited on Ramon Road in Thousand Palms, California. The SOI#1 claimed they stopped at a Mobil gas station where Javier Sanchez-Perfino met the driver of the maroon Jeep Cherokee that the SOI#1 had been transported in the prior day. The SOI#1 stated that the three undocumented aliens were then moved to the maroon Jeep Cherokee. The SOI#1 then said that Javier Sanchez-Perfino, Chilango and himself then returned to Indio, California in the black Yukon. The SOI#1 stated that his friend was waiting at the "Circle K" store located on Clinton Street. The SOI#1 stated that once he obtained the $1,200 dollars from his friend, he paid Javier Sanchez-Perfino.

18.    On August 13, 2003, Border Patrol Agents James Proffitt Jr and Raymond Vega from the Indio Border Patrol Station where assigned duties to the Red Cloud area for traffic observation. The Red Cloud area is notorious for being used by smugglers to transport illegal aliens as they travel through the Chocolate Mountains. At approximately 2:00 a.m., while the agents were traveling west on Bradshaw Trail near Graham Pass, they came upon a broken down 1996 Chevrolet Suburban.

As the agents approached the vehicle, a suspect, later identified as Jose Jesus Garcia-Lozano, an undocumented alien, walked towards their vehicle. The agents noticed that Garcia had a gun in his left hand and the holster in his right hand. Garcia immediately yelled at the agents and said he had a gun and was dropping it. Garcia was subsequently apprehended. Near the Chevrolet Suburban, the agents apprehended a total of nine (9) undocumented aliens. While the agents waited for other agents to arrive to assist with the transportation of the undocumented aliens, a blue 1992 Chevrolet Suburban drove up. The driver was identified as Ernesto MACIAS-Lopez (AKA: Piros), an undocumented alien, and arrested. (The blue Chevrolet Suburban was the same vehicle that the El Centro's Sector Anti-Smuggling Unit had stopped on August 4, 2003 with fifteen (15) undocumented aliens. The vehicle had been illegally recovered the next day). While agent Proffitt transported Garcia to the Border Patrol Checkpoint, Garcia stated that he worked for Perfino. Garcia stated how he knew Perfino well and he needed to work for him for the money. Garcia also stated how he knew the Red Cloud area very well.

19.     On January 14, 2004 at approximately 3:20 p.m., Imperial County Sheriff Deputy Jose Romero was traveling westbound on Skyline Road near old Army Road (this area is sparsely populated and is east of the Chocolate Mountains). Deputy Romero observed a tan colored Dodge Ram traveling eastbound on Skyline Road and stop in front of a residence. Deputy Romero made contact with the occupants of the vehicle. The driver was identified as Javier S. Perfino by his California ID card. The passenger next to him was identified as Raymundo Salazar Castro (subject been apprehended at 1855 Cannon Road on February 24, 2003) by his California ID card. The passenger in the back was identified as Socorro Bernal (subject who assisted in the illegal recover of a seized vehicle on August 5, 2003) with his California driver's license. The three subjects stated to Deputy Romero that they were looking for a subject by the name of Jason Conner. They stated

Conner was going to let them take some parts off of a Monte Carlo. Deputy Romero informed them that there was no such subject that owned property in the area and that they were not to take any parts off any vehicles that were on private property. Deputy Romero confirmed that Perfino had his driver's license suspended or revoked. Deputy Romero cited Perfino for the infraction. All three subjects were allowed to go with Bernal driving the vehicle.

20.    On February 23, 2004 at approximately 3:00 p.m., Border Patrol Agent Randy Brewer from the Indio Border Patrol Station attempted to stop a 1993 white Nissan Sentra on Highway 111 near Mecca Beach, California. The driver did not yield and the vehicle was eventually stopped after agent J. Poulos successfully deployed a controlled tire deflation device. Agent Brewer observed the driver (later identified as Gustavo GARCIA-Martinez and wearing a blue T-shirt with white stripes on the sleeves) and another subject (wearing a black shirt) exit the vehicle and run towards the Salton Sea. Agent Brewer apprehended five (5) undocumented aliens that were still inside the vehicle. After agent Poulos arrived to the agent Brewer's location, agent Brewer began to chase the driver and the other subject, whom he still had a visual of running towards the sea. Agent Brewer was able to apprehend both subjects after a short foot pursuit. All subjects were transported to the Border Patrol Checkpoint on Highway 111. Arriving at the Border Patrol checkpoint, GARCIA was placed in a cell by himself and made spontaneous statements to agent Poulos. The statements were "My lady is in the hospital. I can give names and number. Perfino told me to drive". GARCIA was later read his Miranda Rights in the Spanish language by agent Martinez and witnessed by agent Cavins. GARCIA stated that he made arrangements in Mexicali, Mexico with a man called "El Burro". GARCIA stated that he entered the United States by walking through the mountains with many other individuals until they arrived where there were four vehicles waiting. GARCIA claimed that El Burro told him to drive one of the vehicles to Ontario, California

where a man named Mario Alberto would be waiting for him. GARCIA also named "El Tali", "Enrique" and "La Cangura" as smugglers that are part of the smuggling organization. GARCIA stated that "La Cangura" was the main smuggler. GARCIA stated that Perfino was the second in charge. GARCIA also claimed that Perfino gave him $50.00 in Brawley for gasoline.

21.    On May 30, 2005, Senior Patrol Agents Daniel Castro and Luis Samaniego were assigned to the El Centro Sector Smuggler Targeting Action Team (STAT). The agents were working in plain clothes capacity and in unmarked service vehicles. At approximately 11:10 a.m., agent Castro observed a dark blue Ford Expedition driving onto 4th. Street in El Centro, California from a restaurant parking lot. Agent Castro recognized the driver of the Ford Expedition as an undocumented alien (hereafter SOI#2) the STAT agents had apprehended before. The SOI#2 was initially followed to a house on Heil Avenue in El Centro. Approximately twenty minutes later, SOI#2 and two other individuals departed the residence in the same vehicle and were followed to the parking lot of the Home Depot. All three exited the vehicle and went into the Home Depot. At about 12:05 p.m. all three came out of Home Depot and agents Castro and Samaniego approached them. The SOI#2 was apprehended and transported to the El Centro Border Patrol Station for further interview. The two other individual were released at the scene. After the SOI#2 was interviewed, he was held at the El Centro Processing Center pending removal proceeding.

22.    On June 8, 2005, agents Daniel Castro and Luis Samaniego went to the El Centro Processing Center to interview SOI#2 that was apprehended on May 30, 2005. The SOI#2 stated he was willing to talk to the agents regarding alien smuggling activities. The SOI#2 stated that he works for Javier SANCHEZ-Perfino. The SOI#2 stated that Perfino harbors undocumented aliens in various places in the Imperial Valley. The SOI#2 also stated that Perfino is also known as "Perro" or "Perro Loco". The SOI#2 claimed that he was willing to provide more information at

a later time if the government assisted him with immigration issues. Agents Castro and Samaniego informed the SOI#2 that the government could not promise him anything and that he would have to go through the pending removal proceeding.

23.     On November 17, 2005, Senior Patrol Agents Daniel Castro and Clifford Leyba interviewed Flavio Adrian LUNA-Flores, AKA:Cholo, at the El Centro Border Patrol Station. LUNA had been apprehended by Senior Patrol Agent Luis Macias of the Indio Border Patrol Station on November 16, 2005. LUNA had been with a group of twelve (12) other undocumented aliens in a 1996 black GMC pickup that had attempted to circumvent the Highway 86 U. S. Border Patrol Checkpoint. Agent John Jaurequi had read the Miranda Rights to LUNA and was witnessed by agent Ortiz. LUNA had stated he understood his rights and was willing to answer questions. When LUNA was questioned if he was the driver of the vehicle, he denied he was the driver. When the interview and processing was finished, all subjects were transported to the El Centro Border Patrol Station. At the El Centro Station, LUNA recanted his earlier statement of not being the driver to agents Castro and Leyba. LUNA stated to the agents that he had the arrangements to pick up the illegal aliens two days before. LUNA stated he made the arrangements with a man named "Ferni". LUNA claimed that "Ferni" called him to pick up five (5) illegal aliens on McCullough Road between Dogwood Road and Ross Avenue in El Centro, California. LUNA stated he received the illegal aliens from an individual named "Chicle" who was driving a blue Cavalier. LUNA stated at the time, he (LUNA) was driving a black pickup (the black pickup Indio agent Luis Macias apprehended him with the twelve undocumented aliens the day before). When asked by the agent Castro who gave him the pickup, LUNA said he received it from an individual called "Picos" (known to the agents as Juan Leandro VALENZUELA-Duarte). LUNA then stated he picked up six (6) more illegal aliens from "Ferni" at a house in EL Centro (after the interview, LUNA took the

agents to the house which was identified as 590 W. Main Street in El Centro). LUNA said after he left El Centro, he picked two (2) more aliens near Westmorland, California. LUNA stated he was caught by the "Migra" after getting stuck in the sand while traveling in the desert. When LUNA was asked by agent Castro how much he was going to get paid, LUNA said $700.00 dollars. LUNA stated that he had a partner with him but that he had already been released. LUNA stated his partner is called "Catracho" (known to the agents as Merlin OSORIO-Vasquez). LUNA was asked by agent Castro to whom the aliens he was apprehended with belonged to and he said "Michoacano". LUNA then identified "Michoacano" as Ernesto FONSECA as the boss in Mexicali, Baja California, Mexico. LUNA was asked by agent Castro who the boss was on the north side and LUNA said he has heard the names of "Perro" and "Javier" (known to the agents as Javier SANCHEZ-Perfino) but did not know his entire name.

24.    On December 22, 2005, Senior Patrol Agent Daniel Castro interviewed Aurelio VALENZUELA-Duarte, AKA:Chino, at the United States Attorney's Office in San Diego, California.    VALENZUELA stated that he smuggles illegal aliens for a living.    When VALENZUELA was asked who he works for, he said that he works for Javier Sanchez-Perfino. VALENZUELA stated he has been smuggling aliens for Perfino for about one (1) year. VALENZUELA was asked if he could identify Perfino and he said he could. VALENZUELA said he get paid $100.00 dollars per illegal alien he smuggles. VALENZUELA stated he receives payments from Perfino. VALENZUELA said that he would pick up aliens at a ranch in Holtville, California or from a garage also located in Holtville. When asked to whom the ranch or garage belonged to, VALENZUELA said to a man that he knows as Albert. When asked to whom the aliens belonged to being harbored at the ranch, VALENZUELA said Perfino.

**E.    PROBABLE CAUSE TO SEARCH RESIDENCE OF
        GEORGINA PERFINO**

25.    Based on the information presented in this affidavit, there is probable cause to believe that evidence of Javier Sanchez-Perfino's offenses will be located in the residence of his legal wife, Georgina Perfino.   Based on my training and experience, I am aware that it is common for alien smugglers to prepare, maintain, or store records of their criminal activity and the fruits and instrumentalities of their criminal activities at their residence, and that they also store records relating to their smuggling activities at their residence.

26.    I have conducted surveillance of the residence located at 117 H Street in Brawley, California, intermittently, for several days at a time.  This surveillance has been conducted on and off since April 2004, through the present.  Based on my personal observations, specifically the fact that Javier Sanchez Perfino occasionally spends the night at the residence, keeps vehicles registered in his name continuously at the residence, frequently visits the residence during the daylight hours, and has guests at the residence, it is my opinion that Javier Sanchez Perfino maintains this home as his secondary residence.

**F.    PROBABLE   CAUSE   TO   SEARCH   COMPUTER   EQUIPMNENT   AND
        PERIPHERALS**

27.    Based upon my training, experience and information related to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices including hard disk drives, floppy disks, compact disks, magnetic tapes and memory chips.  I also know that during the search of the premises it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

a)      Searching computer systems is a highly technical process which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application or operating system that is being searched.

b)      Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

c)      The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing fifteen gigabytes of data are now commonplace in desktop computers. Consequently, each non-networked, desktop computer found during a search can easily contain the equivalent of 7.5 million pages of data, which, if printed out, would completely fill a 10' x 12' x 10' room to the ceiling.

d)      Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and

extensions. For example, files with the extension ".jpg" often are image files; however, a user can

easily change the extension to ".txt" to conceal the image and make it appear that the file contains

text. Computer users can also attempt to conceal data by using encryption, which means that a

password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable

form.    In addition, computer users can conceal data within another seemingly unrelated and

innocuous file in a process called "steganography." For example, by using steganography a

computer user can conceal text in an image file which cannot be viewed when the image file is

opened. Therefore, a substantial amount of time is necessary to extract and sort through data that

is concealed or encrypted to determine whether it is evidence, contraband or instrumentalities of a

crime.

        28.    In searching for data capable of being read, stored or interpreted by a computer, law

enforcement personnel executing this search warrant will employ the following procedure:

        a)    Upon securing the premises, law enforcement personnel trained in searching and

seizing computer data (the "computer personnel") will make an initial review of any computer

equipment and storage devices to determine whether these items can be searched on-site in a

reasonable amount of time and without jeopardizing the ability to preserve the data.

        b)    If the computer personnel determine it is not practical to perform an on-site search

or make an on-site copy of the data, then the computer equipment and storage devices will be seized

and transported to an appropriate law enforcement laboratory for review. The computer equipment

and storage devices will be reviewed by appropriately trained personnel in order to extract and seize

any data that falls within the list of items to be seized set forth herein.

        c)    Any data that is encrypted and unreadable will not be returned unless law

enforcement personnel have determined that the data is not (1) an instrumentality of the offense, (2)

a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offense specified above.

d)    In searching the data, the computer personnel will examine all of the data contained in the computer equipment and storage devices to view their precise contents and determine whether the data falls within the items to be seized as set forth herein. In addition, the computer personnel will search for and attempt to recover "deleted," "hidden" or encrypted data to determine whether the data falls within the list of items to be seized as set forth herein.

e)    If the computer personnel determine that the computer equipment and storage devices are no longer necessary to retrieve and preserve the data, and the items are not subject to seizure pursuant to Federal Rule of Criminal Procedure 41(b), the government will return these items within a reasonable period of time not to exceed 30 days from the date of seizure.

29.    In order to search for data that is capable of being read or interpreted by a computer, law enforcement personnel will need to seize and search the following items, subject to the procedures set forth above:

a)    Any computer equipment and storage device capable of being used to commit, further or store evidence of the offense listed above;

b)    Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

c)    Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, and personal digital assistants;

d)      Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices or software.

e)      Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

f)      Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

Any passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data

## G.    <u>Conclusion</u>

Based on the above-described information and observations, I believe there is probable cause to search the following premises for evidence of violations of 8 U.S.C. § 1324, including all items described in Attachment B: 685 N Adams Avenue, Brawley, California; It is further requested that this affidavit and the accompanying applications and warrants be sealed due to the ongoing criminal investigation.

Luis A. Samaniego, Senior Patrol Agent
United States Border Patrol

SUBSCRIBED AND SWORN TO
BEFORE ME THIS ___ DAY
OF OCTOBER 2006

UNITED STATES MAGISTRATE JUDGE
San Diego, California

## ATTACHMENT A

**The premise at 117 H Street, Brawley, California, is further described as follows:**

117 H Street is a one story, single-family residential unit. The house is white in color with gray trim. The front of the property faces south. The front of the property has a concrete driveway. The numbers "117" are clearly affixed to the front of the house. There is no fence around the perimeter of the property. To the north side of the residence is an alley. There is a house on the west and eastside of the target residence. *All computers contained within or on the above described residence are also to be searched.*



**ATTACHMENT B**

1.  **Evidence of fraudulent documentation; passports and U.S. Government documentation evidencing alienage; correspondence, domestic and foreign, evidencing alien-smuggling arrangements; airline/airfare tickets; names of arrangers of alien smuggling; lists containing names of smuggled aliens along with their destination and fees paid or to be paid; registrations and vehicles and titles of vehicles used in the smuggling and transporting of illegal aliens; financial records and bank statements recording the receipt of money from smuggling, cellular telephones and chargers, telephone tolls of calls, documents and receipts evidencing temporary lodging of illegal aliens; documents showing possession, dominion, and/or control of said premises, including canceled mail, keys, rent receipts, utility bills, deeds, leases and photographs; property of smuggled aliens in the form of wallets, purses, suitcases, tote bags, and clothing; checks, money-orders, and money order receipts as well as U.S. and foreign currency.**

2.  **Documents and articles of personal property evidencing the possession, distribution, sale and manufacture of counterfeit U.S. documents, including: ledgers, customer lists, records of counterfeit or genuine document sales, telephone/address books or notebooks containing the names of individuals who have purchased or wish to purchase counterfeit or genuine immigrant documents.**

3.  **Cash or checks or other monetary instruments obtained from the sale of counterfeit or genuine immigration documents, only to the extent that there are actual receipts or proof that the funds are from these illegal activities. Bank accounting, or other financial records which are records of earning or payments relating to the sale of the counterfeit or genuine immigration documents.**

4.  **Counterfeit, genuine or altered immigration or social security documents including counterfeit, genuine or altered Alien Registration Receipts cards including, but not limited to Forms I-551, I-151, I-586, I-186, I-688, I-688A, I-688B and I-94; counterfeit, genuine or altered social security cards; as well as documents and identifications from individual States of the U.S. or other Countries.**

> **All of the property in #1-4 is evidence of offenses in violation of Title 8, United States Code, Section (s) 1324 (a)(2)(B)(ii); 1324 (a)(1)(A)(iii) and (v)(I); 1324 (a)(2)(B)(ii); 1324 (a)(1)(A)(ii) and (v)(II); and 1324 (a)(1)(A)(iii) and (v)(II).**

> **In searching for data capable of being read, stored or interpreted by a computer, law enforcement personnel executing this search warrant will employ the following procedure:**
> **a)     Upon securing the premises, law enforcement personnel trained in searching and seizing computer data (the "computer personnel") will make an initial review of any computer equipment and storage devices to determine whether these items can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve the data.**

b)     If the computer personnel determine it is not practical to perform an on-site search or make an on-site copy of the data, then the computer equipment and storage devices will be seized and transported to an appropriate law enforcement laboratory for review. The computer equipment and storage devices will be reviewed by appropriately trained personnel in order to extract and seize any data that falls within the list of items to be seized set forth herein.

c)     Any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offense, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offense specified above.

d)     In searching the data, the computer personnel will examine all of the data contained in the computer equipment and storage devices to view their precise contents and determine whether the data falls within the items to be seized as set forth herein. In addition, the computer personnel will search for and attempt to recover "deleted," "hidden" or encrypted data to determine whether the data falls within the list of items to be seized as set forth herein.

e)     If the computer personnel determine that the computer equipment and storage devices are no longer necessary to retrieve and preserve the data, and the items are not subject to seizure pursuant to Federal Rule of Criminal Procedure 41(b), the government will return these items within a reasonable period of time not to exceed 30 days from the date of seizure.

29.     In order to search for data that is capable of being read or interpreted by a computer, law enforcement personnel will need to seize and search the following items, subject to the procedures set forth above:

a)     Any computer equipment and storage device capable of being used to commit, further or store evidence of the offense listed above;

b)     Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

c)     Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, and personal digital assistants;

d)     Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices or software.

e)     Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

f)     Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

Any passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data